UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BRYAN DiFRANCESCO as father and
natural guardian of the infant minor, LD,

|                    | Plaintiffs, | **Hon. Hugh B. Scott** |

13CV148

v.                              CONSENT

**Order**

WIN-SUM SKI CORP.,
HOLIDAY VALLEY, INC.,

Defendants.

---

The parties then consented to proceed before the undersigned as Magistrate Judge, including presiding over a jury trial (Docket No. 37). Presently before the Court are the parties' first round of motions in limine in preparation for a jury trial. Defendants first submitted their motion in limine (Docket No. 53). Plaintiffs' then filed their motion in limine (Docket No. 56). Defendants then supplemented their motion in limine (Docket No. 58). As scheduled in the Final Pretrial Order (Docket No. 40), these initial motions in limine were due by January 3, 2017 (id.), later extended at the parties' request to January 6, 2017 (Docket No. 42); responses initially were due by January 17, 2017, and they were to be argued with the Final Pretrial Conference on January 18, 2017, and then be deemed submitted (Docket No. 40). Responses to these motions were postponed then and were due by February 3, 2017 (Docket No. 63), which defendants submitted (Docket No. 65) and plaintiffs submitted (Docket No. 66); and reply by February 10, 2017 (Docket No. 63), which defendants submitted (Docket No. 67) and plaintiffs submitted

(Docket No. 68); and argument was held on February 16, 2017 (Docket Nos. 63, 69 (minutes)).

These motions were deemed submitted at the conclusion of oral argument. During that

argument, scheduling for the Pretrial Conference and jury selection and trial were discussed with

the trial reset for July 17, 2017 (Docket No. 69; see Docket Nos. 70, 71). The jury selection and

trial of this case was scheduled for February 1, 2017 (Docket No. 40, Final Pretrial Order), but

was later adjourned (Docket Nos. 63, 64).

Separately, this Court addressed plaintiffs' motion for a protective Order and to quash

two subpoenas (Docket Nos. 43 (motion), 70, Order of February 22, 2017), familiarity with

which is presumed.

## BACKGROUND

This is a diversity personal injury action. Plaintiffs are a Canadian father and daughter,

while defendants are New York corporations which operate Holiday Valley. Plaintiff LD

(hereinafter "LD," cf. Fed. R. Civ. P. 5.2) was a five-year-old in 2010 who skied at Holiday

Valley. Plaintiffs allege that LD was injured falling when from a chairlift at Holiday Valley

(Docket No. 1, Compl.; see Docket No. 43, Pls. Atty. Decl. ¶ 3, Ex. B).

According to plaintiffs' earlier motion, LD was participating in a ski lesson at Holiday

Valley on February 15, 2010, under the supervision of defendants' employee, a ski instructor,

when she fell from the chairlift sustaining injuries to her left leg and left hip. Plaintiffs allege

negligent instruction and supervision during the course of that lesson resulting in LD's fall.

(Docket No. 43, Pls. Atty. Decl. ¶¶ 3, 9, Ex. E; see id., Pls. Memo. at 1-2.)

The Scheduling Order (after extensions, see Docket Nos. 14-15, 20, 23, 25, 27) in this

case had discovery conclude on April 30, 2015 (Docket No. 27; see Docket No. 43, Pls. Atty.

Decl. Ex. D).  No motions to compel were filed and the parties reported on October 5, 2015,

readiness for trial (Docket No. 30).  Plaintiffs' motion to quash subpoenas and for a protective

Order led to the parties exchanging supplemental discovery, which was to be completed by

April 5, 2017 (Docket No. 70, Order of Feb. 22, 2017, at 21, 22).

*Defendants' First Motion in Limine (Docket No. 53)*

Pursuant to the Final Pretrial Order (Docket No. 40), defendants filed their motion in

limine, seeking preclusion of portions of the opinions of plaintiffs' expert, Dick Penniman;

evidence of defendants' subsequent remediation; and evidence of prior and subsequent incidents

similar to the accident at issue (Docket No. 53).  Plaintiffs' response and defendants' reply will

be addressed below at each particular item.

*Plaintiffs' Motion in Limine (Docket No. 56)*

Plaintiffs also filed their timely motion in limine (Docket No. 56), seeking to preclude

evidence that infant LD assumed the risk of riding the chairlift, evidence from LD's injury at

Holimont in 2015, and evidence of a disclaimer that plaintiffs argue is against public policy (id.).

Defendants argue that plaintiffs' motion in limine is in fact an untimely motion for

summary judgment and that issues of fact exist, hence there is no basis to preclude evidence as to

plaintiffs' assumption of the risk or comparative negligence (Docket No. 65, Defs. Memo. at 5-

6).  They contend that the registration form with the release signed by LD's uncle is admissible

because the release tracks the "Warning to Skiers" required by New York General Obligations

Law § 18-106(1)(a) and regulations under 12 N.Y.C.R.R. § 54.5(*l*)(1) (id. at 7).  They fault

plaintiffs for not addressing <u>Vanderwall v. Troser Management, Inc.</u>, 244 A.D.2d 982,

665 N.Y.S.2d 492 (4th Dep't 1997), <u>leave to appeal denied</u>, 91 N.Y.2d 811, 671 N.Y.S.2d 714

(1998) (id.).  That case charged the jury there with express assumption of the risk for exposure to

drainage ditches even though those risks were not enumerated in "Warning to Skiers,"

Vanderwall, supra, 244 A.D.2d at 982, 665 N.Y.S.2d at 493 (id.).

*Defendants' Supplemental Motion in Limine (Docket No. 58)*

        Defendants later supplemented their motion in limine seeking preclusion of undisclosed

expert testimony and to limit as expert testimony from LD's parents as to her treatment (both

past and future) and LD's physical therapist testifying as to causation and diagnosis (Docket

No. 58).

        Plaintiffs' respond that they did provide disclosure of future medical expenses;

alternatively, they contend that defendants waived any objection to an omitted response by not

moving to compel or for preclusion (Docket No. 66, Pls. Memo. at 16-18).

        During oral argument of plaintiffs' motion for a protective Order and to quash the two

subpoenas (Docket No. 69), the parties submitted on their respective papers for these motions in

limine (id.).  They also discussed the need to supplement their disclosure, especially LD's future

medical treatment and needs (id.).

DISCUSSION

I.     Applicable Standards

        In a diversity jurisdiction action, this Court initially must apply the substantive law of our

forum state, New York, see Erie R.R. v. Tompkins, 304 U.S. 64 (1983); Ocean Ships, Inc. v.

Stiles, 315 F.3d 111, 116 n.4 (2d Cir. 2002), including its choice of law regime, Klaxon v.

Stentor, 313 U.S. 487 (1941).  This Court has to apply New York law as construed by the highest

court of the state, the New York State Court of Appeals, not the local intermediate appellate

court.  When the New York State Court of Appeals has not ruled on the particular question, this Court then has to predict the direction the Court of Appeals would go if given that issue, see Gasperini v. Center for Humanities, Inc., 66 F.3d 427, 430 (2d Cir. 1995).

In personal injury actions, New York generally applies the law of the jurisdiction in which the injury occurred.  See Cooney v. Osgood Machinery, Inc., 81 N.Y.2d 66, 595 N.Y.S.2d 919 (1993); Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64 (1972).  "New York's current choice-of-law rules require the court to consider the following three elements:  the domicile of the plaintiff, the domicile of the defendant, and the place where the injury occurred." Lucas v. Lalime, 998 F. Supp. 263, 267 (W.D.N.Y. 1998) (Heckman, Mag. J., R&R, adopted by Arcara, J.).  Where more than one element is in the same state, that state's law should apply.  Id.; Datskow v. Teledyne Continental Motors, 807 F. Supp. 941, 943 (W.D.N.Y. 1992) (Larimer, J.). Under these choice of law rules "the first step in any case presenting a potential choice of law is to determine whether there is an actual conflict between the laws of the jurisdiction involved." Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).

Here, the accident and defendants are in New York, plaintiffs are from Ontario.  As a second[1] Neumeier situation, **New York** law would apply, Neumeier, supra, 31 N.Y.2d at 128, 335 N.Y.S.2d at 70; Cooney v. Osgood Machinery, Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922 (1993) (conduct-regulating laws, the law of the jurisdiction where the tort occurs applies while loss allocation laws have additional factors to determine which jurisdiction applies,

---

[1]The second Neumeier situation is the defendant is from state A, plaintiff from state B, state A is where tort occurs; state A allows recovery, defendant cannot invoke state B's law, similarly if state A does not allow recovery, defendant is not liable, thus state A's law applies; or, as stated in New York Jurisprudence Conflict of Laws § 57, 19A N.Y. Jur., where local law favors respective domiciliary, the law of the place of injury generally applies, Neumeier, supra, 31 N.Y.2d at 128, 335 N.Y.S.2d at 70.

citations omitted).  In addition, the parties in effect have stipulated to apply forum (New York)

law to this case.  Both sides cite New York law and made no reference to any other jurisdiction's

law having application.  Neither side has presented any law that conflict with New York law.

New York courts enforce stipulations to choice of law, see Hamilton v. Accu-Tek, 47 F. Supp.2d

330, 343 (E.D.N.Y. 1999) (citing, among other cases, Tehran-Berkeley Civil & Envtl. Eng'rs v.

Tippetts-Abett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) (parties briefed New York

law, court applies New York law based upon implied consent of parties)); Roginsky v.

Richardson-Merrell, Inc., 378 F.2d 832, 834 n.2 (2d Cir. 1967) (Friendly, J.); Klein v. Jostens,

Inc., No. 83 Civ. 5351, 1985 U.S. Dist. LEXIS 18115, at *6 n.1 (S.D.N.Y. July 9, 1985).  As a

result **New York** law applies and the legal issues surrounding these evidentiary disputes will be

resolved under New York law.

II.      Application

       A.       Plaintiffs' Motion in Limine, Docket No. 56

             1.       Preclude Evidence of LD's Assumption of Risk

The heart of this case is whether this five-year-old child can assume the risk inherent with

riding and dismounting from a chairlift under New York law.  Cases from New York State courts

leave as an issue of fact for the jury whether a particular infant (regardless of the child's age) was

capable of assuming the risk of his or her activities.  New York courts do not create a bright line

rule that minors at five years or older are incapable of assuming risk, but cf. Smith v. Sapienza,

115 A.D.2d 723, 496 N.Y.S.2d 538 (2d Dep't 1985) (holding, as matter of law, that three and a

half year old child victim of dog attack was incapable of being held responsible for his actions

for contributory negligence).  New York common law "has long disclaimed any per se rule with

regard to the age at which a child cannot legally assume a risk and thereby not be responsible for comparative fault for his or her injury," Clark v. Interlaken Owners, Inc., 2 A.D.3d 338, 340, 770 N.Y.S.2d 58, 60 (1st Dep't 2003) (Tom, J., dissent).  The majority of Clark court held that assumption of risk doctrine did not apply to a five-year-old playing around exposed construction equipment, "where the danger was even more accessible [than another case cited] and the risk at least as unappreciated by this five-year-old plaintiff," 2 A.D.3d at 340, 770 N.Y.S.2d at 60 (emphasis supplied), citing Roberts v. New York City Hous. Auth., 257 A.D.2d 550, 685 N.Y.S.2d 23 (1st Dep't), leave to appeal denied, 93 N.Y.2d 811, 694 N.Y.S.2d 633 (1999), concluding that instructing the jury on assumption of the risk was error as a matter of law, Clark, supra, 2 A.D.3d at 340, 770 N.Y.S.2d at 60.  In Roberts, the Appellate Division held a "six-year old under these circumstances" that is, a child exposed to a steam line fenced off by an easily breached fence next to the lawn where children played, did not have the doctrine of assumption of risk apply, 257 A.D.2d at 550, 685 N.Y.S.2d 24, 23.  Roberts provided an opportunity for establishing an age-based bright line rule but the court decided on the specific facts of that case; hence the standard plaintiffs are in effect arguing was not adopted by New York courts.

Plaintiff argues that LD was just days away from being one year older than the non sui juris status of age four and being incapable as a matter of law being culpable (Docket No. 66, Pls. Opp. Memo. at 4-5).  Assumption of risk is a distinct defense from contributory negligence, see Arbegast v. Board of Educ. of S. New Berlin Cent. School, 65 N.Y.2d 161, 165, 490 N.Y.S.2d 751, 754-55 (1985), but both defenses are subject to the doctrine of non sui juris, see M.F. v. Delaney, 37 A.D.3d 1103, 1104-05, 830 N.Y.S.2d 412, 414 (4th Dep't 2007) (assumption of risk and culpable conduct by plaintiffs should have been dismissed because plaintiffs were 2

and 3 years old and hence were <u>non sui juris</u>).  Plaintiffs point to the concept of <u>non sui juris</u> that absolves children of a certain age or younger from culpability since (as a matter of law) they are incapable of comprehending danger to be negligent or responsible for her actions, <u>Republic Ins. Co. v. Michel</u>, 885 F. Supp. 426, 432-33 (E.D.N.Y. 1995) (Azrack, Mag. J.).  Over the age of four, the status of a child is a question of fact regarding the particular child's ability to comprehend danger and care for herself, <u>id.</u> at 432; younger than four years of age, "an infant . . . may be so young that he is unable to apprehend the existence of danger, take precautions against it and exercise any degree of care for his own safety.  The law calls such a child, <u>non sui juris</u>," <u>id.</u> at 433; <u>see also id.</u> at 433 n.8 (literal translation of Latin phrase is "not his own master," quoting <u>Black's Law Dictionary</u> 1058 (6th ed. 1990)).  The <u>non sui juris</u> child is incapable of committing negligence, <u>id.</u> at 433.  "Where an infant is older than four years of age, the status of that child as <u>sui juris</u> or <u>non sui juris</u> is to be determined by the trier of fact," <u>id.</u> (citing cases), with factors of the child's intelligence and maturity dictating that status, <u>id.</u>  One federal court, applying New York contributory negligence doctrines, held that the status of a child over the age of four was a question of fact addressing "the particular child's ability to comprehend danger and care for himself," <u>Republic Ins. Co.</u>, <u>supra</u>, 885 F. Supp. at 432 (<u>see</u> Docket No. 67, Defs. Reply Memo. at 5-6).  If there is a bright-line rule under New York law, the age is four years old, not five as was LD when she was injured.

      The age of the plaintiff is a factor in determining whether they are capable of assuming risk of their actions, <u>see</u> <u>Trupia v. Lake George Cent. Sch. Dist.</u>, 14 N.Y.3d 392, 396, 901 N.Y.S.2d 127, 130 (2010); <u>Clark</u>, <u>supra</u>, 2 A.D.3d at 340, 770 N.Y.S.2d at 60 (error to instruct on assumption of risk for five-year-old on construction vehicle) (Docket No. 54, Pls. Tr.

Memo. at 6); <u>Roberts</u>, <u>supra</u>, 257 A.D.2d 550, 685 N.Y.S.2d at 24; <u>Trippi v. Basile</u>, 44 A.D.2d

759, 354 N.Y.S.2d 235, 236 (4th Dep't 1974) (error to instruct jury that five and half year old

child contributorily negligent, and could be so charged only if he had the age, experience,

intelligence development and mental capacity to understand the meaning of the statute violated

and to comply therewith) (Docket No. 54, Pls. Tr. Memo. at 5-6).  As noted by the Court of

Appeals in <u>Trupia</u>, <u>supra</u>, 14 N.Y.3d at 396, 901 N.Y.S.2d at 130, in an almost 12-year-old

child's claim from sliding down a bannister, that court states that children often act impulsively

or without good judgment, "they do not thereby consent to assume the consequently arising

dangers" for assumption of risk.  Plaintiffs distinguish <u>DeLacy v. Catamount Dev. Corp.</u>,

302 A.D.2d 735, 755 N.Y.S.2d 484 (3d Dep't 2003), due to the plaintiffs in that case being two

years older than LD was in 2010 (Docket No. 68, Pls. Reply Memo. at 5; <u>see also</u> Docket No. 66,

Pls. Memo. at 4; <u>but cf.</u> Docket No. 65, Defs. Memo. at 5-6).  But the New York Court of

Appeals has not ruled on this question, but the consensus of other New York courts do not

recognize a bright line rule that at age five or six a child is incapable of having the requisite

knowledge and maturity to assume the risks of their actions; <u>non sui juris</u> status is applicable to

four years old and that age or older is an issue of fact.

Courts in New York have concluded that assumption of the risk is a question of fact for

the jury, <u>Moore v. Hoffman</u>, 114 A.D.3d 1265, 1266, 980 N.Y.S.2d 684, 685 (4th Dep't 2014), in

particular, riding and dismounting a chairlift has risks that raises questions of fact, <u>DeLacy</u>,

<u>supra</u>, 302 A.D.2d at 736, 755 N.Y.S.2d at 486 (questions of fact whether a seven-year-old

novice skier fully appreciated the risks associated with using a chairlift) (Docket No. 65, Defs.

Memo. at 6).  One factual element in this case is the maturity and knowledge of LD as to

whether she assumed the risk of riding the chairlift here despite being five years old.  LD

testified at her deposition that prior to the 2010 incident she rode chairlifts two or three other

times, each time with her father plaintiff Bryan DiFrancesco who assisted her getting on and off

the lift (Docket No. 56, Pls. Atty. Decl. ¶ 18, Ex. C, LD EBT Tr. at 9), even to having Bryan

hold his ski pole over LD's lap until it was time to get off the chairlift (id., Tr. at 9).  Whether

LD in her circumstances could assume the risk of riding and disembarking from the chairlift by

herself is an issue of fact and evidence regarding her maturity, age, experience, intelligence,

literacy, and mental capacity to understand the risks she faced is relevant and admissible.  As a

result, plaintiffs' motion precluding evidence of LD assuming the risk is **denied**.

This is notwithstanding defendants' argument that plaintiffs' motion in limine here is in

fact an untimely motion for summary judgment (Docket No. 65, Defs. Memo. at 5-6; Docket

No. 67, Defs. Reply Memo. at 2-3).  As plaintiffs rebut (Docket No. 68, Pls. Reply at 2-4), they

are not seeking entry of judgment to dismiss a defense, instead they properly seek preclusion of

evidence.  But the factual issues in this case under New York law require production of evidence

of LD's capacity to assume risk.

2.      Preclude Evidence of LD's 2015 Snowboarding Incident

Plaintiffs next seek excluded evidence from an accident LD had at Holimont in 2015

resulting in injuries to her clavicle, contending that the evidence is prejudicial and would be

admitted to show her to be accident prone (Docket No. 56, Pls. Memo. at 7-10).  LD's injuries in

2010 were to her left leg and hip and not to her clavicle (id. at 8).  As argued in the motion to

quash the subpoena to Holimont (Docket No. 43, Pls. Memo. at 7), LD did not waive the

physician-patient privilege for LD's treatment of the 2015 injuries (Docket No. 56, Pls. Memo. at

10

8, 9-10).  Plaintiffs conclude that LD's subsequent snowboarding accident is not relevant to her 2010 injuries (id. at 9).

Defendants contend that LD's injuries are not limited to her leg and hip, but also include loss of enjoyment of life and emotional injuries (Docket No. 65, Defs. Memo. at 12, citing Docket No. 56, Pls. Atty. Decl., Ex. H, Response to Defs. Interrog. No. 1).  Again, as argued to defend the subpoena upon Holimont, defendants contend that Second Department law provides that LD put her physical condition at issue, justifying admissibility of her 2015 injuries (Docket No. 65, Defs. Memo. at 13).

But as noted in deciding plaintiffs' earlier motion (Docket No. 43), this Court in diversity is bound by the common law of New York as settled by the New York State Court of Appeals or this Court's prediction of how the New York Court of Appeals would decide the issue if brought to it (see Docket No. 70, Order of February 22, 2017, at 13).  This Court has held that the Court of Appeals, if it addressed the waiver of physician-patient privilege, would limit that waiver to so much of LD's physical or mental condition placed in controversy here (id. at 17; see id. at 16-17 (holding that plaintiffs have standing to object to the subpoena based upon the unwaived privilege)).  This case is about LD's injuries from the 2010 incident, with physical injuries to her lower body.  Discussion of LD's accident five years later and to an unrelated body part is not relevant to her claims and would prejudice plaintiffs, see Fed. R. Evid. 403.  Admitting evidence of the 2015 accident would introduce character evidence that LD acted in accordance with a particular trait (clumsiness), see Fed. R. Evid. 404(a)(1).  Defendants have other means of establishing the limits on LD's loss enjoyment of life and limitations on her activities after the

2010 accident (such as her father's deposition testimony as to her activities, <u>see</u> Docket No. 43, Pls. Atty. Decl., Ex. C, Bryan DiFrancesco EBT Tr.10-21, 23, 95-96)).

This Court ordered plaintiffs to produce for <u>in camera</u> inspection the Holimont medical records from the 2015 incident for this Court to determine if there is anything applicable to this case, such as distinguishing 2010-caused injuries from 2015 injuries or the effects of the 2015 incident on LD's 2010 injuries (Docket No. 70, Order of Feb. 22, 2017, at 17-18).   This <u>in camera</u> inspection was for this Court to determine if there is anything applicable to this case, such as discussion of LD's 2010 injuries or distinguishing 2010-caused injuries from 2015 injuries or the effects of the 2015 incident had on LD's 2010 injuries (Docket No. 70, Order of Feb. 22, 2017, at 17-18).   This Court received those <u>in camera</u> medical records (received March 6, 2017)[2] and reviewed them and find that the following documents should be produced and those that should not.   Below is Table 1, a spreadsheet listing the reviewed documents and their production status.

---

[2]These documents were not Bates numbered or otherwise identified or paginated.  Thus, this Court described the reviewed documents by their date and generic type, to avoid disclosure of contents.

Table 1.

| Date | Document Identifier | Produce or Not? | No. of Pages | Notes |
|---|---|---|---|---|
| | | | | |
| 4/1/17 | Memorandum | Produce | 2 | |
| 1/19/15 | Memorandum | Do Not Produce | 1 | |
| 1/20/15 | Letter | Do Not Produce | 2 | |
| 1/28/15 | Note | Do Not Produce | 3 | Jan. 28, 2015, note refers to prior left femur fracture, to be seen in June 2015 for that. Notes for Feb. 11, Mar. 5, and Mar. 16, 2015, appointments |
| 3/5/15 | Active Body Clinic ("ABC") progress note | Do Not Produce | 1 | |
| 5/3/15 | McMaster Univ. note | Do Not Produce | 1 | |
| 3/11/15 | ABC progress note | Do Not Produce | 1 | |
| 3/13/15 | ABC progress note | Do Not Produce | 2 | |
| 4/1/15 | ABC progress note | Do Not Produce | 1 | |
| 4/13/15 | ABC progress note | Do Not Produce | 1 | |
| 1/4/15 | Consultation report | Produce | 1 | |
| 7/30/15 | Notes | Produce | 3 | July 30 and Aug. 11, 2015, notes refer to leg treatment |
| 7/30/15 | Hamilton Health Sciences note | Produce | 1 | |

The documents ordered to be produced are those relevant to LD's 2010 injuries, namely to her left leg and hips. Excluded are those documents that refer only to her 2015 clavicle injury. The documents that plaintiffs are to produce are the April 1, 2017, memorandum; the January 4, 2015, consultation report; notes from July 30, 2015; and the July 30, 2015, notes from Hamilton Health Sciences. The remaining documents exclusive involve the 2015 incident and injury and there was not connection made to LD's 2010 injuries.

Thus, so much of plaintiffs' motion (Docket No. 56) to preclude evidence from LD's 2015 Holimont accident is **granted in part, denied in part**, with plaintiffs only to produce the documents identified above.

### 3.    Preclude Evidence as Against Public Policy

Plaintiffs point to General Obligations Law § 5-326 that render defendants' disclaimers as the operator of a place of amusement void as against public policy (Docket No. 56, Pls. Memo. at 4-5), see Rogowicki v. Troser Mgmt., 212 A.D.2d 1035, 623 N.Y.S.2d 47 (4th Dep't 1995).  Defendants counter that the statutory and regulatory scheme under the Safety in Skiing Code, N.Y. Gen. Oblig. L. § 18-106; Labor Law §§ 202-c (use of ski tows), 867 (Safety in Skiing Code), authorized the release warning given in the form signed by LD's uncle (Docket No. 65, Defs. Memo. at 7), see Vanderwall, supra, 244 A.D.2d at 982, 665 N.Y.S.2d at 493.

Plaintiffs also argue that any release here would be ineffective as to LD since she never read or signed it, hence it could not serve as a waiver of liability for her injuries (Docket No. 56, Pls. Memo. at 5), see Franco v. Neglia, 3 Misc. 3d 15, 776 N.Y.S.2d 690 (N.Y. App. Term 2004) (release invalid against 14-year-old participant, who signed release, in first kickboxing class); Kaufman v. American Youth Hostels, Inc., 6 A.D.2d 223, 229, 177 N.Y.S.2d 587, 593 (2d Dep't 1958) (release signed by father invalid for child's injuries) (id.).  Plaintiffs' reply that defendants fail to address how LD's uncle can bind LD on the registration form waiver (Docket No. 68, Pls. Reply Memo. at 4), by not distinguishing Franco, supra, 3 Misc. 3d 15, 776 N.Y.S.2d 690 (N.Y. App. Term 2004), or Kaufman, supra, 6 A.D.2d 223, 229, 177 N.Y.S.2d 587, 593 (2d Dep't 1958) (id.).  They note that General Obligations Law § 18-106(a)(1) lists the risks inherent in skiing but do not mention the risks inherent in riding a chairlift (id.).  Specifically, none of those

14

risks include having a second child obey a sign to open the chairlift bar prematurely and the

negligent location of that sign (see id. at 4-5).  Plaintiffs argue that assumption of risk is not

automatic for every personal injury case that a novice (regardless of their age) cannot as a matter

of law assume a risk (id. at 6, citing Corrigan v. Musclemakers Inc., 258 A.D.2d 861, 863,

686 N.Y.S.2d 143, 145 (3d Dep't 1999) (injured 49-year-old woman who never been on

treadmill)).

But in Franco the infant fourteen-year-old plaintiff signed the release, 3 Misc. 3d at 16,

776 N.Y.S.2d at 691.  The Supreme Court, Appellate Term, held that an infant is not bound by

releases which exculpate defendants from damages for personal injury "since they lack the

capacity to enter into such agreements," id., at 16, 776 N.Y.S.2d at 691 (citing Kaufman, supra,

6 A.D.2d 223, 177 N.Y.S.2d 587).  The plaintiff's decedent fifteen-year-old child in Kaufman,

supra, 6 A.D.2d at 229, 225, 177 N.Y.S.2d at 593, 589, signed the release with her father.  The

Appellate Division, applying Oregon law, see id. at 225, 177 N.Y.S.2d at 589, held that the effect

of the father's signature was ambiguous, id. at 229, 225, 177 N.Y.S.2d at 593, 589.  The

decedent's capacity there to sign the release by reason of her infancy "was effectively exercised

by [her] by the act of commencing this action," id., at 229, 177 N.Y.S.2d at 593.  The Appellate

Division upheld striking the defense of decedent's release because she disaffirmed "the

agreement by reason of her infancy" exercised by her father's commencement of this action but

reversed regarding striking that defense for the father's separate action against the hostel, id. at

229, 177 N.Y.S.2d at 593.  Neither case held that the signature of the parent or guardian alone of

a release was binding upon the infant for whom the guardian signed.  Thus, these cases do not go

as far as plaintiffs contend to render ineffective a release signed by a guardian on behalf of an infant participating in a risky activity.

a.      Infant Disaffirmance of Release

"A minor is not bound by a release executed by his parent," <u>Alexander v. Kendall Cent.</u>

<u>Sch. Dist.</u>, 221 A.D.2d 898, 899, 634 N.Y.S.2d 318, 319 (4th Dep't 1995); <u>I.C. ex rel. Solovsky</u>

<u>v. Delta Galil USA</u>, 135 F. Supp. 3d 196, 209 (S.D.N.Y. 2015); <u>Shields v. Gross</u>, 58 N.Y.2d 338,

344, 461 N.Y.S.2d 254, 257 (conceding that infant, Brooke Shields, could under common law

disaffirm consent executed by another on her behalf), <u>rehearing denied</u>, 59 N.Y.2d 762,

463 N.Y.S.2d 10030 (1983).  The exception from this common law power of the infant to

disaffirm written consents made on her behalf is where the New York State Legislature either

abrogates this common law right or makes particular infant agreements binding upon the infant,

<u>Shields</u>, <u>supra</u>, 58 N.Y.2d at 344-45, 461 N.Y.S.2d at 257.

While conceding that at common law an infant could disaffirm written consent made for

her, the Court of Appeals in <u>Shields</u> recognized that the State Legislature could abrogate that

right or create a right upon infants to enter into binding contracts, <u>id.</u>, 58 N.Y.2d at 344, 461

N.Y.S.2d at 257.  "Where a statute expressly permits a certain class of agreements to be made by

infants, that settles the question and makes the agreement valid and enforceable," <u>id.</u>, 58 N.Y.2d

at 344, 461 N.Y.S.2d at 257, with that statute being construed strictly, <u>id.</u>, 58 N.Y.2d at 344, 461

N.Y.S.2d at 257 (citing McKinney's Consol. Laws of N.Y., Book 1, Statutes § 301(b)).

Here, the Safety in Skiing Code had as part of its legislative purpose

"(3) that it is appropriate, as well as in the public interest, to take such steps as are
necessary to help reduce the risk of injury to downhill skiers from undue,
unnecessary and unreasonable hazards; and (4) that it is also necessary and
appropriate that skiers become apprised of, and understand, the risks inherent in
the sport of skiing so that they may make an informed decision of whether or not
to participate in skiing notwithstanding the risks. Therefore, the purpose and
intent of this article is to establish a code of conduct for downhill skiers and ski

17

> area operators to minimize the risk of injury to persons engaged in the sport of downhill skiing and to promote safety in the downhill ski industry,"

N.Y. Gen. Oblig. L. § 18-101.  The act establishing this Code empowered the New York State Commissioner of Labor to promulgate "any and all rules and regulations necessary to the timely implementation of the provisions of this act," 1988 N.Y. Laws ch. 711, § 4.  These regulations "applies to all skiers and ski areas" and owners and operators of ski areas to which the Code applied to, N.Y. Comp. Codes R. & R. tit. 12, § 54.1 (2017) (hereinafter cited as "12 N.Y.C.R.R."), without special provision or exception for juvenile skiers.  That same act authorized the Commissioner of Labor to make rules to guard "against personal injuries to employees and the public in the use and operation of ski tows, other passenger tramways and downhill ski areas," N.Y. Labor Law § 202-c.

The Code also imposed on skiers the additional duties "to enable them to make informed decisions as to the advisability of their participation in the sport," to

> "seek out, read, review and understand, in advance of skiing, a 'Warning to Skiers' as shall be defined pursuant to subdivision five of section eight hundred sixty-seven of the labor law [N.Y. Labor L. § 867(5)], which shall be displayed and provided pursuant to paragraph a of subdivision one of this section [N.Y. Gen. Oblig. L. § 18-106(a)]; and . . . to obtain such education in the sport of skiing as the individual skier shall deem appropriate to his or her level of ability, including the familiarization with skills and duties necessary to reduce the risk of injury in such sport,"

N.Y. Gen. Oblig. L. § 18-106(2), (a), (b); <u>see</u> N.Y. Labor Law § 867(5); 12 N.Y.C.R.R. §§ 54.5(*l*)(1), 54.4(c)(1); <u>see also</u> N.Y. Gen. Oblig. L. § 18-106(1)(a) (ski are operator's duty to post conspicuously "Warning to Skiers").  "Unless otherwise specifically provided in this article, the duties of skiers, passengers, and ski area operators shall be governed by common law," N.Y. Gen. Oblig. L. § 18-107.

The Safety in Skiing Code and its regulations provide an abrogation of the common law right of an infant skier to disaffirm the release signed on her behalf.  First, the State Legislature used the term "skier" without expressly distinguishing the age of skier.  Second, the State Legislature authorized and directed the Commissioner of Labor to enact necessary rules and regulations.  Pursuant to that authority, the Commissioner enacted 12 N.Y.C.R.R. § 54.1 to have the regulations under the Safety in Skiing Code apply to "all skiers," again without distinction due to the age of the skier.  The definitions under these regulations for "skier," 12 N.Y.C.R.R. § 54.3(h) ("Skier means any person wearing a ski or skis and any person actually on a ski slope or trail located at a ski area, for the purpose of skiing"), or "passenger," 12 N.Y.C.R.R. § 54.3(d) ("Passenger means a person in or on or being transported by a tramway"), riding a "passenger tramway," <u>see</u> 12 N.Y.C.R.R. § 54.3(e) ("Passenger tramway means a mechanical device intended to transport skiers for the purpose of providing access to ski slopes and trails as defined by the Commissioner of Labor pursuant to Section two hundred two-c or eight hundred sixty-seven of the Labor Law [N.Y. Labor Law §§ 202-c, 267]"), also do not create a separate infant category.  Although the Court of Appeals refers to the State Legislature either abrogating the infant's common law right of disaffirmance or conferring upon the infant a recognized right to make binding contracts, <u>Shields</u>, <u>supra</u>, 58 N.Y.2d at 344, 461 N.Y.S.2d at 257, the State Legislature here enacted the code that delegated to the Commissioner of Labor the authority to enact rules and regulations necessary to implement the Code.  The Commissioner, by requiring regulations to apply to "all skiers" either abrogated an infant's common law right of disaffirmance or authorized infant skiers to enter into binding contracts with ski area operators,

including the warning and release to authorize the infant skier to engage in the risky activities of skiing and the related, risky activities leading up to skiing.

The Safety in Skiing Code statutory and regulatory scheme including "all skiers" makes releases signed by adults bind infant skiers and removes the infants' common law right to disaffirm the releases executed in their minority.  On this basis, plaintiffs' motion in limine to exclude the Holiday Valley release (Docket No. 56) is **denied**.

b.      Effect of General Obligations Law § 5-326

As an alternative grounds for its decision, the Appellate Division, Fourth Department in Vanderwall, supra, 244 A.D.2d at 982-83, 665 N.Y.S.2d at 493, narrowed the scope of the general provisions for amusement or recreation sites under General Obligations Law § 5-326 to exclude ski resorts from that statute, with those resorts being governed by the Safety in Skiing Code and its Warning to Skiers codified in General Obligations Law § 18-106(1)(a) (Docket No. 65, Defs. Memo. at 7), see also N.Y. Gen. Oblig. Law § 18-107 ("unless otherwise specifically provide in this article, the duties of skiers, passengers, and ski area operators shall be governed by common law").  Part of the Safety in Skiing Code includes use of a ski tow, N.Y. Labor Law § 202-c.

The Holiday Valley registration form (Docket No. 56, Pls. Atty. Decl. Ex. G) signed by LD's uncle, Dean DiFrancesco, had the adult signer agree that he acknowledged (among other things)

> "that I have read and understand the information contained in the brochure for the Holiday Valley Mountain Adventure Children's Ski and Snowboard Program, and also understand and am aware that there are inherent and other risks involved in participating in ski and snowboard lessons, skiing/riding, and use of lifts, which could cause death or serious injury to the registrant(s).  This includes use of chairlifts and or tows or boardwalks with or without an instructor.

> **"[C]hildren may be required to ride chairlifts with other children in the class, ski patrol/hosts, or other persons in the lift line while loading assistance may be given by chairlift attendants.  Riding a chairlift can be a hazardous activity for your child(ren).**  By allowing the registrant(s) to ride a chair lift, you acknowledge the dangers involved and accept any and all risks of injury to the registrant(s).  Other risks include, but are not limited to, . . . boarding, riding and disembarking from moving chairlifts, rope tows or boardwalks.  With full knowledge of the danger involved, I voluntarily request that the registrant(s) participate in the program.  **I have read this agreement to the registrant(s) and he/she has acknowledged that he/she understands its contents.**  On behalf of the registrant(s) and myself, I expressly assume all risks inherent in the sport of skiing and riding and any and all damages, injury, illness, or harm which may result directly or indirectly from said risks."

(Id., paragraphs 5, 6, emphasis added.)  This release itself raises factual issues, such as whether Uncle Dean DiFrancesco actually read the release to LD and whether she understood its contents, including the risks stated therein (particularly, the risks in riding and dismounting a chairlift).

The statutory scheme for ski resorts provided in the Safety in Skiing Code provides a more specific regime that the General Obligations Law § 5-326 for other recreational facilities including the basis for the release executed by LD's uncle.  New York public policy carved out ski resorts from the general ban on releases by recreational facility operators.  On this alternative ground, plaintiffs' motion to exclude that release (Docket No. 56) is **denied**.

 B. Defense Motions in Limine, Docket Nos. 53, 58

  1. Excluding Evidence of Subsequent Remediation

In their initial motion in limine, defendants seek to exclude evidence of their subsequent remediation in changing signage at the chairlift (Docket No. 53, Defs. Memo. at 2-4).  Federal Rule of Evidence 407 precludes admission of evidence of subsequent remedial measures to prove negligence, culpable conduct, or a need for a warning (id. at 2).  They also contend that

evidence as a warning should be excluded under Rule 403 since the probative value is exceeded by its prejudice to them (id.).  Plaintiffs counter that this evidence is admissible for impeachment or to contest the feasibility of relocating the sign to a safer location (Docket No. 66, Pls. Memo. at 1-3; see also Docket No. 68, Pls. Reply Memo. at 8), see Fed. R. Evid. 407; Pitasi v. Stratton Corp., 968 F.2d 1558 (2d Cir. 1992).  Defendants reply that the impeachment exception to Federal Rule of Evidence 407 should be narrowly read, that it could only be used to avoid the jury being misled (Docket No. 67, Defs. Reply Memo. at 8-9).  They conclude that plaintiffs also should be precluded from introducing evidence regarding the red light/green light system used by another ski resort, Holimont, arguing that Holimont installed this system four years after the 2010 incident at issue here (id. at 10; see also Docket No. 53, Defs. Memo. at 3-4; Docket No. 53, Defs. Atty. Decl., Ex. C).

The questions here under Rule 407 are at what point (if ever) may plaintiffs impeach defendants with the change in the sign location, and whether the sign location can be introduced by them as to feasibility.  As for impeachment, whether plaintiffs can discuss relocation of the sign will depend upon what defense witnesses testify about to the warnings provided on site on the chairlift.  Rulings on this point **will await trial testimony**.

As for feasibility, plaintiffs **may introduce sign location and alternative locations** if defendants' witnesses testify as to the feasible location for warning signs.

As to the probative/prejudice balance under Rule 403, evidence inadmissible under Rule 407 "would also likely lead to prejudice and confusion under Rule 403," Bak v. Metro-North R.R., No. 12 Civ. 3220 (TPG), 2015 U.S. Dist. LEXIS 60736, at *7 (S.D.N.Y. May 8,

2015), but remedial evidence may be admitted for rebuttal or impeachment evidence, <u>id.</u>, without affecting the probative/prejudice balance of Rule 403.

Finally, Holimont currently uses a red light/green light on its chairlifts to advise skiers when to disembark from the chairlift.  But that system was implemented years after this incident (Docket No. 53, Defs. Atty. Decl. Ex. C, Aff. of David Riley ¶¶ 1, 4-8 (Holimont general manager); Docket No. 53, Defs. Memo. 3-4).  Holimont general manager David Riley stated that he had not seen this light warning system in United States slopes prior to his tour of Europe in 2014 (Docket No. 53, Defs. Atty. Decl. Ex. C, Riley Aff. ¶ 8).  Thus, it was not feasible in 2010 to have such a light warning system and admission of evidence of the Holimont lighting system would be prejudicial.  Plaintiffs **are precluded** from introducing evidence of this system as a feasible alternative.

Defendants' motion in limine (Docket No. 53) on this ground is **granted in part**, with some issues to be decided **at trial upon the proffer or introduction of evidence** at issue.

2.      Prohibit Plaintiffs' Liability Expert, Dick Penniman,

Defendants next seek to preclude testimony from plaintiffs' expert, Dick Penniman, on various subjects.  Plaintiffs globally respond that Penniman is a forty-year veteran of the ski industry, performing various duties as a member of ski patrol, lift operator, ski lift maintenance man, and "mountain manager/assistant operations manager" of a number of ski areas (Docket No. 66, Pls. Memo. at 11; Docket No. 66, Pls. Atty. Decl. ¶¶ 27-29, Ex. Q (Penniman curriculum vitae)).  Penniman testified as an expert in <u>Whitford v. Mt. Baker Ski Area, Inc.</u>, Case No. C11099112RSM, 2012 U.S. Dist. LEXIS 40166 (W.D. Wash. Mar. 23, 2012) (Docket No. 66, Pls. Memo. at 11), opining in that case about the lift attendant's duties and whether a

catch net used at that resort was adequate, id., 2012 U.S. Dist. LEXIS 40166, at *4.  Plaintiffs

conclude that defense objections to Penniman goes to the weight, not the admissibility, of his

expert testimony (id. at 10, 11).  Plaintiffs do not provide a point-for-point refutation of defense

objections to Penniman as an expert.

As noted by the court in Whitford, supra, 2012 U.S. Dist. LEXIS 40166, at *3, "the trial

court must act as a 'gatekeeper' to ensure that proffered expert testimony is both relevant and

reliable," id. citing Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 147 (1999).  Where expert

testimony is technical rather than purely scientific, "the Court must ensure that it 'rests on a

reliable foundation and is relevant to the task at hand,'" id. (quoting United States v. Hermanek,

289 F.3d 1076, 1093 (9th Cir. 2002) (quoting in turn Daubert v. Merrel Dow Pharmaceuticals,

Inc., 509 U.S. 579, 597 (1993))).  As gatekeeper, this Court has to "make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterize the practice of an expert in the

relevant field," Kumho, supra, 526 U.S. at 152; Whitford, supra, 2012 U.S. Dist. LEXIS 40166,

at *3-4.  The Whitford court, in considering testimony for other specialized knowledge,

construed Federal Rule of Evidence 702 liberally, 2012 U.S. Dist. LEXIS 40166, at *4 (citing 9th

Circuit case and Fed. R. Evid. 702 advisory committee note, 2000 amendment, rejection of an

expert is the exception rather than the rule).

From Penniman's curriculum vitae (Docket No. 66, Pls. Atty. Decl. Ex. Q), his expertise

is ski patrol (including lift operation and hazard evaluation and mitigation), avalanche safety, and

slope preparation.  He worked for two years supervising lift operations in Chile (id.).  Since

1983, Penniman has been a consultant and expert witness; he was qualified as an expert in safe

skiing including lift operations and ski instruction (id.).  As a threshold matter, Penniman's

expert testimony comes from decades of performing various tasks at several ski resorts and

evaluating skiing hazards.

Next, this Court turns to the specific defense objections to Penniman's expert testimony.

a.    Prohibit Penniman from Opining Regarding Relocation of
Unload Sign

First, defendants seek to bar Penniman's opinion about the proper location of signage for

unloading or discharging skiers from the chairlift (the "unload/open restraint bar") and changes

in the text of the registration form (Docket No. 53, Defs. Memo. at 4-5, 6-7).  As for Penniman

opining on sign location, his expertise as a ski lift operator and evaluator of skiing accidents

informs his opinions about such things.  Penniman lists in his curriculum vitae experience in

signage at two ski resorts (Docket No. 66, Pls. Ex. Q), but does not specify if this includes the

location of chairlift instructions or warning signage.  The bulk of his stated expertise and

experience involves avalanches, so the signage Penniman is familiar with appears to be for ski

trails.  In his deposition regarding signage, Penniman testified that applicable New York State

regulations when the Creekside lift was erected in 2003 were based on the American National

Standards Institute ("ANSI") standards from 1999[3], with a 2006[4] amendment of ANSI standards

expressly calling for sign placement (Docket No. 53, Defs. Ex. F, Penniman EBT Tr. at 23).  The

2006 ANSI amendments grandfathered pre-2006 construction to be governed by earlier

standards (id., Tr. at 25), but the 2006 standard for sign location called for signs to be ahead of

the off load point (id., Tr. at 25-26), while the 1999 standard did not require signage at all (id.,

Tr. at 24, 39).  Penniman noted that one ski resort, White Pine, had its raise bar signs in front of

---

[3]Pls. Ex. 67.
[4]Pls. Ex. 68; Defs. Exs. 56, 65.

shacks near the unload points (id., Tr. at 28), while at other resorts, Penniman observed these signs either on chairlift towers 20-30 feet before the unload area or as close to the unload area as possible (id., Tr. at 32-34; Docket No. 66, Pls. Ex. P, Tr. at 33-34).  Penniman concluded that defendants violated New York State standards for the location of Holiday Valley's signs, violating ANSI 1999 and 2003 standards that signage be ahead of the offload area (Docket No. 53, Defs. Ex. F, Tr. at 37-38).  Penniman did not know if New York State inspected the location of these signs (id., Tr. at 40-41).  Penniman noted that New York law also required use of the restraint bar on chairlifts; requiring a rider to not use a restraint bar for 50 yards, Penniman opined, would require the rider to violate New York law (id., Tr. at 38).

From review of Penniman's deposition testimony, the issue is whether placement of the offload warning sign should be at the offload area or in advance of that area (e.g., id., Tr. at 39).  Penniman's experience seems to be from his observations at various resorts, without knowing the written policies for sign placement at those areas.  A foundation, therefore, will need to be established that Penniman has sufficient expertise in sign location of chairlift instructions to credit Penniman's opinion as an expert.  Penniman's testimony also **is limited regarding subsequent changes** in the sign location, as indicated above.  Defendants' motion in limine (Docket No 53) on these grounds is **granted**.

> b.      Prohibit Plaintiffs' Expert Penniman from Opining on Risk of Chairlift Not Being Inherent to Skiing

Next, defendants seek to preclude Penniman's opinion on the risk of using a chairlift not being inherent to skiing (Docket No. 53, Defs. Memo. at 5-6).  Plaintiffs argue that the New York Court of Appeals decision in Trupia, supra, 14 N.Y.2d 392, 901 N.Y.S.2d 127, changed the

standards for primary assumption of the risk that coincides with Penniman's opinion that use of a chairlift is distinct from the sport of skiing (Docket No. 66, Pls. Memo. at 6-7).

There is a preliminary question whether this is an evidentiary issue or a matter requiring an expert opinion at all.  New York cases recognize that use of a chairlift is an inherent part of skiing, with distinct risks from the sport of skiing.  There are separate, but related, duties of care with operating a chairlift and downhill skiing, Morgan v. Ski Roundtop, Inc., 290 A.D.2d 618, 620, 736 N.Y.S.2d 135, 137 (3d Dep't 2002) (hereinafter "Ski Roundtop") (inherent risk in skiing and "some risk of injury inherent in entering, riding and exiting from a chairlift"); see Morgan v. New York State, 90 N.Y.2d 471, 485, 662 N.Y.S.2d 421, 427 (1997); Miller v. Holiday Valley, Inc., 85 A.D.3d 1706, 1707, 925 N.Y.S.2d 785, 787-88 (4th Dep't 2011); see also Tone v. Song Mtn. Ski Ctr., 113 A.D.3d 1126, 1127, 977 N.Y.S.2d 857, 858 (4th Dep't 2014) (claim from chairlift, assumption of risk applied for "athletic activity," quoting Ski Roundtop, supra, 290 A.D.2d at 620, 736 N.Y.S.2d at 137).  As defendants note (Docket No. 67, Defs. Reply Memo. at 4), riding and disembarking a chairlift is inherent in Alpine downhill skiing, see also Litz v. Clinton Cent. Sch. Dist., 126 A.D.3d 1306, 5 N.Y.S.3d 636 (4th Dep't 2015) (assumption of risk for playing hockey applied to injury suffered in rink locker room).

Factually, Trupia involved horseplay on a bannister by a twelve-year-old, rather than engaging in a sporting activity or the steps leading to that activity (with the inherent risks of those steps), supra, 14 N.Y.2d at 393, 396, 901 N.Y.S.2d at 128, 129.  Again, this is more akin to the ancillary dangers in the locker room preparing for participation in a sport, e.g., Litz, supra, 126 A.D.3d 1306, 5 N.Y.S.3d 636; but for the sporting activity, a participant would not be injured in the locker room or on the chairlift, each is necessary to prelude to athletic

participation.  This participant is only in these places to engage in a sport with its own inherent

dangers and risks.

　　As noted in Whitford, supra, 2012 U.S. Dist. LEXIS 40166, at *9, wherein Penniman was

accepted as an expert, he "is not required to be an expert in the law; he is only required to be an

expert in the subject matter of his testimony," id.  Thus, as a matter of law, there are risks,

distinct from those in alpine skiing, to riding a chairlift that are related to those of skiing.  This

does not require an expert opinion one way or the other.  Defense motion in limine on this point

(Docket No. 53) is **granted**.

　　　　　　　c.　　　Prohibit Penniman from Opining on the Registration Form

　　Defendants next contend that Penniman lacked any foundation to make an opinion about

the registration form used by Holiday Valley (Docket No. 53, Defs. Memo. at 6-7; Docket

No. 53, Defs. Atty. Decl. Ex. E, Penniman's Supp'al Expert Report at 5; see Docket No. 66, Pls.

Atty. Decl., Ex. L, at 5).  They object to Penniman's supplemental opinion that noted defendants'

changes to the registration form to require a parent to initial the form at paragraph 6 on chairlift

use (Docket No. 53, Defs. Memo. at 4-5; Docket No. 53, Defs. Atty. Decl. Ex. E, at 5; see

Docket No. 66, Pls. Atty. Decl., Ex. L, at 5).  Plaintiffs do not respond specifically to this

objection.  Penniman opined that the sentence about a child riding the chairlift without adult

supervision was vaguely written (Docket No. 53, Defs. Atty. Decl. Ex. E, at 5; see Docket

No. 66, Pls. Atty. Decl. Ex. L, at 5; Docket No. 53, Defs. Memo. at 6).

　　Again, looking at the actual registration form quoted above (at pages 19-20, supra),

participants are warned that children may ride with other children on the chairlift, followed by a

warning that riding the chairlift "can be a hazardous activity for your child(ren)" (Docket No. 56,

28

Pls. Atty. Decl. Ex. G, paragraph 6). That text implies that children may ride together without an adult. As noted in detail by defendants (Docket No. 53, Defs. Memo. at 7), Penniman lacks expertise in developing ski school policies, drafting registration forms, or have expertise in human factors, engineering, or psychology. Thus, his opinion on the text of the registration form is a little more informed than that of a layperson. Penniman's opinion in this area is **excluded**; defendants' motion in limine (Docket No. 53) on this ground is **granted**.

As for Penniman's observation of the post-accident changes in the form (Docket No. 53, Defs. Ex. E, at 5; Docket No. 66, Pls. Ex. L, at 5), this also goes to proof of subsequent remediation and, unlike the impeachment use plaintiffs propose for the relocation of signs or feasibility of change, Penniman's opinion on the changes in the registration form would only come as part of his direct testimony. Such introduction violates Rule 407 and its prejudice outweighs its probative value under Rule 403. Defendants' motion in limine (Docket No. 53) as to Penniman's opinion in this area is **granted**.

### d. Prohibit Penniman from Opining on Human Factor

Defendants next argue that Penniman lacks the qualifications to opine on the impact of the human factor in this incident (Docket No. 53, Defs. Memo. at 7-8). Penniman testified that generally an infant should have been accompanied by an adult on a chairlift based on "best practices." Penniman based these best practices on his experience, observations, and involvement in ski schools and he concludes that a majority of ski areas "are concerned about small children riding up chairs alone, or with other kids without an adult accompanying them. There are some I have observed where they don't care. But the majority do, and I call that best practices." (Docket No. 53, Defs. Ex. F, Penniman EBT Tr. at 65-67, 66; Docket No. 66, Pls.

Ex. P, excerpts of Penniman EBT Tr. at 65-67, 66.)  Penniman testified that, from the age of 8,

he had observed ski schools recruit adults to ride up with unaccompanied children, that the "vast

majority [of resorts] do," or so Penniman found (Docket No. 53, Defs. Ex. F, Tr. at 67; Docket

No. 66, Pls. Ex. P, Tr. at 67).  He noted that other ski areas do not let small children on chairlifts

and "the majority of ski resorts, when it's not an instruction situation, leave that decision up to

the parents" (Docket No. 53, Defs. Ex. F, Tr. at 67; Docket No. 66, Ex. P, Tr. at 67).  But

Penniman had not investigated the policies of individual ski resorts in New York  whether they

require adult accompaniment on chairlifts and he could not testify to written policies of ski

resorts (Docket No. 53, Defs. Ex. F, Tr. at 67; Docket No. 66, Ex. P, Tr. at 67).  Penniman,

however, admitted that he was not familiar with Holimont's policies regarding adult

accompaniment or the policies of other Western New York ski resorts on this issue (Docket

No. 53, Defs. Ex. F, Tr. at 18-19).

Penniman's opinion on how small children react on chairlifts may be informed by his

experience operating ski lifts, observing at ski resorts, and investigating skiing accidents, but this

expertise does not rise to the level that it should be credited as an expert.  Similar to the

registration form objection, Penniman's expertise is in ski resort operations and not on how

patrons will react.  Defendants' motion in limine (Docket No. 53) on this ground is **granted**.

> e.    Prohibit Penniman from Opining about the Operation of a
>        Ski School

Defendants contend that Penniman cannot render an opinion about how to operate a ski

school due to lack of qualifications on how to operate such a program and not knowing Holiday

Valley's policies (Docket No. 53, Defs. Memo. at 9).  Defendants point out that Penniman

testified that he was only at level one (of three levels) as a certified ski instructor by the

Professional Ski Instructors of America (or "PSIA") (id.; Docket No. 53, Defs. Ex. F, at 11) and that Penniman was never employed as a ski instructor at any resort where he worked (Docket No. 53, Defs. Ex. F, at 12), but he later stated that he taught skiing informally and once at a resort as a ski patroller (id. at 41-42).  Penniman also admitted that he never developed policies for a ski school (Docket No. 53, Defs. Ex. F, at 13).  According to plaintiffs' retort, Penniman performed several different tasks in the ski industry for forty years (Docket No. 66, Pls. Memo. at 10-11), including experiences with ski schools and policies of the White Pine Ski Area related to children riding chairlifts (Docket No. 66, Pls. Atty. Decl. ¶ 29.d., Ex. P, Penniman EBT Tr. at 19-20 (being familiar with policies of resorts regarding children on chairlifts), membership in the PSIA (id., Ex. Q), and as a private ski instructor (id., ¶ 29.e., Ex. P, Penniman EBT Tr. at 42-44).  He was qualified as an expert on skiing safety including chairlift operations and ski instruction (id.).

Reviewing his experience and stated expertise, Penniman essentially provided private ski lessons, "step[ped] in once at White Pine" ski resort as an instructor while a ski patroller and provided instruction, and instructed ski patrollers (Docket No. 53, Ex. F, at 42-43).  He admits to never developing policies for a ski school.  Given that the focus of Penniman's expertise is more on trails (such as avalanches); his experience is only slightly more than a layperson regarding ski school policies.  This is despite the fact that Penniman has testified as an expert in Whitford (but cf. Docket No. 66, Pls. Memo. at 11); in that case he testified about the lift attendant's duties and the adequacy of the chairlift's safety netting, supra, 2012 U.S. Dist. LEXIS 40166, at *4.  Penniman there was not asked to opine on ski school policies (see Docket No. 67, Defs. Reply Memo. at 7).

Thus, defendants' motion in limine (Docket No. 53) on Penniman rendering his opinion on ski school policies is **granted**.

> f.      Prohibit Penniman from Opining on the Custom for Chairlift Signage

Defendants next argue that Penniman should not be allowed to testify about customary chairlift signage or sign location (Docket No. 53, Defs. Memo. at 9-10).  Again, plaintiffs apparently rely upon Penniman's forty years of experience operating ski lifts and in the ski industry generally and do not point to specifics as to his expertise regarding the customary location of warning signage (see Docket No. 66, Pls. Atty. Decl. ¶ 29.e., h., Ex. P, Penniman EBT Tr. at 33-34, 68-69).  Penniman's experience as to the location of unloading signage is at three North America ski areas and his 40 years of seeing where signs have been located at those and other ski resorts (Docket No. 66, Pls. Atty. Decl. ¶ 29, e. h.).  Again, Penniman lists experience in "signing" at two ski resorts (Docket No. 66, Pls. Ex. Q) without specifying what signage he positioned.  Continuing to review Penniman's stated experience, most of his training focused on ski patrol, avalanches, and ski safety, with attendance at a congress for transportation by wire rope in 1999 and ski lift maintenance.  He is affiliated with the International Society of Skiing Safety and the PSIA.  These could be sources for Penniman's opinion about the national or continental safety standards, but a foundation needs to be established to confirm this before Penniman's opinion on this subject is admissible.  As noted above, the basis for Penniman's opinions are from his observation of practices at ski areas and what he believes to be best practices.  But he extrapolates this experience to conclude continental practices regarding where these signs are placed and should be placed without additional foundation.  Absent such a foundation for a broader opinion, Penniman can only testify to his observations of what he

observed at other ski resorts.  Defendants' motion in limine (Docket No. 56) on this issue is

**granted in part**.

        3.      Exclude Prior and Subsequent Incidents at Holiday Valley

Finally in the initial motion in limine, defendants argue that evidence of prior and

subsequent incidents of youths falling from chairlifts at Holiday Valley should not be admitted

(Docket No. 53, Defs. Memo. at 10-17; Docket No. 56, sealed Exs. G-S).  They argue that

introducing all of these incidents would be prejudicial to them, Fed. R. Evid. 403 (Docket

No. 53, Defs. Memo. at 15, 11-15).  Defendants argue that the Creekside open restraint bar sign

was moved to Tower 6 after LD's accident.  Therefore, subsequent incidents would allow

plaintiffs, by the "back door," to introduce evidence of subsequent remediation (id. at 16).

Further, only one incident (Docket No. 56, Defs. Ex. Q) involved Creekside chairlift, while other

post-2010 incidents (id., Defs. Exs. R-S) are not substantially similar to LD's incident (see

Docket No. 53, Defs. Memo. at 16).

Plaintiffs argue that defendants did not cite federal cases on the admissibility of

subsequent accidents (Docket No. 66, Pls. Memo. at 14).  They claim one subsequent incident

was similar (id. at 15; Docket No. 66, Pls. Atty. Decl. ¶ 35, Ex. X) (four-year-old fell from Mardi

Gras chairlift on February 26, 2012).

Plaintiffs argue that evidence of prior incidents is admissible under Federal Rule of

Evidence 401 to show the existence and notice of the dangerous condition (Docket No. 66, Pls.

Memo. at 12).  They also claim that proof of subsequent accidents also is admissible to show the

existence of the dangerous condition (id.).  They reviewed defendants' reports of similar

incidents both before and after LD's 2010 accident and argue that several of them are admissible

since they present examples of youth slightly older than five-year-old LD (ages six to ten years old before the 2010 accident, and a four-year-old after[5]) opening the restraining bar prematurely due to the location of the signs instructing them to open that bar (id. at 12-14; Docket No. 66, Pls. Atty. Decl. ¶ 34, Exs. S, T, U, V, W; ¶ 35, Ex. X).  Plaintiffs argue that pictures after 2010 showing relocation of the signs would be admissible only to rebut testimony regarding feasibility, impeaching the defense of culpable conduct (id. at 14).  Their claim is that "very young children were needlessly exposed to serious injury by having the 'open restraint bar' sign posted too far away from the unload point, and resulting in the restraint bar being lifted at a point when the chairlift is too far above the ground," hence it was unnecessary for plaintiffs to allege that the chairlift itself was defective (id. at 15); if there was any defect, it was in the location of the signage relative to the height of the chairlift.

a.     Prior Incidents

As for prior incidents at Holiday Valley, they are admissible in this case provided they are "substantially similar" to the 2010 accident on trial here, Bellinger v. Deere & Co., 881 F. Supp. 813, 817 (N.D.N.Y. 1995) (case citations omitted); see Sawyer v. Dries & Krump Mfg. Co., 67 N.Y.2d 328, 336, 502 N.Y.S.2d 696, 701 (1986) (under New York law, similar prior accidents are admissible to show dangerousness of conditions and notice) (Docket No. 53, Defs. Memo. at 11).  Defendants note (id.) that New York law allows admission of proof of similar incidents to show dangerousness of conditions and notice, Sawyer, supra, 67 N.Y.2d at 336, 502 N.Y.S.2d at 701.  The parties differ here on whether the prior incidents are substantially similar to LD's 2010 accident.  As defendants concede that one incident of the eleven prior

---

[5]According to the report for that accident, Feb. 26, 2012, the injured four-year-old was sitting next to his father on the chairlift when he fell, Docket No. 66, Pls. Atty. Decl. ¶ 35.a., Ex. X.

incidents at Holiday Valley identified by defendants is substantially similar to LD's situation (id.; see Docket No. 53, Defs. Atty. Decl. Ex. A, Pls.' Response to Interrogatories, Interrogatory No. 11), that a five-year-old novice skier riding a chairlift unaccompanied by an adult fell between Towers 5 and 6 of the Creekside chairlift.  The conceded incident **is admissible**.  The ten other prior incidents (Docket No. 56, Defs. Atty. Exs. G-P) had one or two distinguishing facts that defendants conclude makes them not sufficiently similar to be admissible.

Table 2 below lists the factors defendants argue distinguish these ten prior incidents from LD's 2010 incident, listing the youths as they were identified by defendants (Docket No. 53, Defs. Memo. at 12-15), cf. Fed. R. Civ. P. 5.2.

Table 2:

| Factor | Incident # |
|---|---|
| Riding with parent or other adult[6] | 1, 2, 4, 7, 8, 9 |
| Not during a skiing lesson | 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 |
| No mention of used restrain bar or did not involve the bar | 1, 2, 3 |
| Not at same chairlift as Creekside | 1, 2[7], 4, 6, 7, 8, 9, 10 |
| Fall not between Towers 5 and 6 at Creekside | 5 |

Two of the prior incidents are also distinct due to the greater expertise of the youth skier (#8, Docket No. 53, Defs. Memo. at 14-15; Docket No. 56, Defs. Ex. N) and the age of the skier as compared with LD's age in 2010 (#10, 16 year old, Docket No. 56, Defs. Ex. P) who was

---

[6]Injured youth #3 rode with a brother whose name was redacted by defendants, Docket No. 53, Defs. Memo. at 12; Docket No. 56, Ex. I.  The report does not give the brother's age; thus, it is presumed that he is a minor as well.

[7]Defendants claim that this incident occurred at Creekside, Docket No. 56, Defs. Ex. H; see Docket No. 66, Pls. Ex. S, but defendants argue that it did not occur at a similar location, Docket No. 53, Defs. Memo. at 12.  They distinguish this incident since there is no reference to use of a restraint bar, Docket No. 67, Defs. Reply Memo. at 11.  The lift operator's description of that incident, however, said that the restraint bar was up, Docket No. 56, Ex. H, at 2.

involved in horseplay that led to the fall (Docket No. 53, Defs. Memo. at 15; Docket No. 56, Defs. Ex. P).

Plaintiffs argue that whether these prior incidents were during a ski lesson is immaterial to whether they are similar to LD's 2010 experience (Docket No. 66, Pls. Memo. at 12). But one factor here is that LD was a relative novice in 2010 and had not ridden on a chairlift unaccompanied by an adult. Also, plaintiffs' claim is for inadequate supervision by the ski instructor while LD was on the chairlift (Docket No. 1, Compl. ¶ 15); that inadequacy would not occur in prior incidents that were not ski lessons. Therefore, to be sufficiently similar to LD's circumstances, the prior instances must factor in the experience of the youth involved, shown by defendants from whether the incidents occurred during a ski lesson (as was for LD) as well as a review of the incident reports showing whether these youths were identified as being "novices" in the ability and days skied portions of the Holiday Valley incident reports.

To plaintiffs, "the similar circumstances at issue in this case are a very young child falling off a chair lift when the restraint bar was lifted at the point indicated by the 'open restraint bar' sign" (Docket No. 66, Pls. Memo. at 13). The prior incidents occurred at various chairlifts at Holiday Valley and the records for each incident does not indicate either where the "open restraint bar" signs were relative to where the youths fell or the distance they were from the appropriate discharge point. At least one youth, #3 (Docket No. 56, Defs. Ex. I) appears to have fallen shortly after boarding the chairlift. Another prior incident occurred at Tower 4 of School House chairlift, well before Towers 5 and 6 of Creekside where LD fell (Incident #5, Docket No. 56, Ex. K). Thus, it is difficult to determine if these falls at other chairlifts were similar to LD's fall at Creekside.

Plaintiffs next point to five prior instances that they claim were substantially similar to LD's in which the restraint bar was opened prematurely and each child fell (Docket No. 66, Pls. Memo. at 13-14; Incident #2, 4, 6, 7, 9 (Docket No. 56, Defs. Ex. H, J, L, M, O; see also Docket No. 66, Pls. Atty. Decl. Exs. S, T, U, V, W).  Defendants reply that plaintiffs' parsing of these prior incidents focus on singular favorable points and did not meet the burden of establishing that any of these incidents were substantially similar to LD's 2010 incident (Docket No. 67, Defs. Reply Memo. at 10-11).  They again distinguish these five incidents from the 2010 incident (id. at 11-12).

Incidents where the child was riding with a parent or other adult are not substantially similar to LD riding without an adult.  The location of the fall also has to be similar to the 2010 Creekside incident; one of the issues is the location of the warning signage and where the restraining bar was lifted or the youth attempted to dismount (see also Docket No. 67, Defs. Reply Memo. at 11, on Incident #4, Docket No. 56, Defs. Ex. J; Docket No. 66, Pls. Ex. T). While not considered by the parties, the age as well as the experience of the youth involved (shown by whether use of the lift was during a ski lesson and the identified skiing ability on the Holiday Valley incident reports) is an important factor to determine if a prior incident was substantially similar to LD's incident.

The next table (Table 3) lists the prior incidents at issue, the defense and plaintiffs' exhibits identifications, the age of the youth, and their skiing experience (novice or not).

Table 3:

| Incident # | Docket No. 56, Defs. Ex. | Docket No. 66, Pls. Ex. | Injured Youth's Age | Injured Youth Novice Skier? |
|---|---|---|---|---|
| 1 | G | | 9 | Yes; first day |
| 2 | H | S | 7 | Yes; 2-9 days skied |
| 3 | I | | 5 | Yes |
| 4 | J | T | 8 | Yes; 10 plus days skied |
| 5 | K | | 6 | No; first day |
| 6 | L | U | 10 | No; 2-9 days skied |
| 7 | M | V | 6 | No; 2-9 days skied |
| 8 | N | | 6 | No; 10 plus days skied |
| 9 | O | W | 6 | Yes; 2 days skied |
| 10 | P | | 16 | Yes; 2-9 days skied |

Reviewing these prior incidents, the five identified by plaintiffs **are not sufficiently similar** to LD's 2010 experience to admit them into evidence.  These incidents each had an adult present (#2, 4, 7, 9, Docket No. 56, Defs. Exs. H, J, M, O; Docket No. 66, Pls. Exs. S, T, V, W); or were not during a ski lesson (#2, 4, 6, 7, 9, Docket No. 56, Defs. Exs. H, J, L, M, O; Docket No. 66, Pls. Exs. S, T, U, V, W); or were not at the Creekside chairlift or the youths did not fall at a point similar to where LD fell from the Creekside chairlift (id.).  But the child in Incident #9 was a six-year-old novice who skied for two days, describing the incident as lifting the safety bar "at prescribed point" (rather than earlier), slipped forward and left the lift (#9, Docket No. 56, Defs. Ex. O; Docket No. 66, Pls. Ex. W).  Finally, LD is younger than any of the youth in the prior incidents.

One incident defendants attempt to distinguish, Incident #2, involves a fall by a seven-year-old novice skier (with two to nine days skied) at Creekside where the chairlift stopped thirty

feet from the unloading ramp and the lift operator reported that the restraint bar was up (Docket No. 56, Defs. Ex. H; Docket No. 66, Pls. Ex. S).  The lift operator went to the child and "waited for parents" prior to ski patrol arriving (Docket No. 56, Defs. Ex. H, at 2; Docket No. 66, Pls. Ex. S, at 3).  It is unclear where defendants got the impression that the parents were with that child on the chairlift.  This incident is **similar to LD's experience** and thus **is admissible**.

Therefore, Incident #2 (Docket No. 56, Defs. Ex. H; Docket No. 66, Pls. Ex. S), and the incident conceded by defendants to be similar **are admissible**, but the other prior incidents identified by defendants are **not similar and are inadmissible**.  Defendants' motion in limine (Docket No. 53) as to the admission of evidence of prior incidents substantially similar to LD's 2010 incident is **granted in part**, save for the conceded prior incident.

b.      Subsequent Incidents

As for subsequent incidents (Docket No. 56, Defs. Exs. Q-S; Docket No. 66, Pls. Ex. X (Feb. 26, 2012, incident), Table 4 lists these incidents, with this Court continuing the incident numbering scheme the parties used for the prior incidents.

Table 4:

| Incident # | Docket No. 56, Defs. Ex. | Docket No. 66, Pls. Ex. | Injured Youth's Age | Injured Youth Novice Skier? |
|---|---|---|---|---|
| 11 | Q | | 6½ | No; 2-9 days skied |
| 12 | R | | 8 | No; 10 plus days skied |
| 13 | S | X | 4 | [not reported] |

Plaintiffs argue that one incident, #13 (Docket No. 56, Defs. Ex. S; Docket No. 66, Pls. Ex. X) is similar to LD's 2010 (Docket No. 66, Pls. Atty. Decl. ¶ 35).  There, a four-year-old youth was riding with his father on February 26, 2012, and was on a different chairlift, Mardi Gras,

approximately 32 yards from the bull wheel (Docket No. 56, Defs. Ex. S; Docket No. 66, Pls. Ex. X).  According to the eight-year-old sister of that youth, that child wiggled in the chairlift seat and fell from it (id.).  These differences distinguish this incident from LD's by the later child riding with a parent and no mention of the restraint bar having a role in the incident.  This incident is distinct from LD's.

As for the other two incidents, the youths were older than LD and had more skiing experience.  Incident #11 (Docket No. 56, Defs. Ex. Q) is the closest to LD's 2010 experience; that incident had a 6½ year old youth fall from the Creekside chairlift 62 feet above Tower 5. That youth claimed he "never really got on chair" and the chair stopped and he fell (id. at 1). Witnesses reported that the restraint bar was down as other skiers held the youth until losing their grip (id. at 7).  But this incident is sufficiently distinct from what LD experienced to **not admit** that subsequent incident into evidence.

Thus, the subsequent incidents are **inadmissible**.  Defendants' motion in limine on this ground (Docket No. 53) is **granted** as discussed above.

4. Defense Supplemental Motion (Docket No. 58), Exclude Non-Disclosed Expert Testimony

In their supplemental motion in limine (Docket No. 58), defendants next ask that undisclosed plaintiffs' expert testimony be excluded (id., Defs. Memo. at 2-3).  Plaintiffs contend that they did disclose regarding future medical expenses; alternatively, they argue that defendants waived any objection to that disclosure by not moving to compel further disclosure (Docket No. 66, Pls. Memo. at 16-18; see also Docket No. 68, Pls. Atty. Reply Decl.¶ 3, Ex. A (supplementing plaintiffs' discovery).  Plaintiffs also argue that defendants overstate the scope of the witnesses defendants claim are plaintiffs' experts (plaintiff Bryan DiFrancesco, wife

Natascha DiFrancesco, and brother Dean DiFrancesco); for example, uncle Dean DiFrancesco would not testify as an expert regarding inadequate supervision but would testify as to his expectation regarding supervision of youth (Docket No. 66, Pls. Atty. Decl. ¶ 36).  During oral argument, plaintiffs offered to supplement evidence of LD's future medical requirements (see Docket No. 69).  The parties reserved the right to file a new round of motions in limine regarding this supplementation (as well as other supplemented discovery).

Plaintiffs do not list the DiFrancescos as expert witnesses in their pretrial submissions (see Docket No. 54, Pls. Pretrial Memo. at 14-15), only expressly identifying Penniman as their expert witness (id. at 21).  Defendants' supplemental motion in limine (Docket No. 58) on this ground is **deemed moot**, but subject to renewal upon receipt of the supplemental discovery.

### 5.    LD's Mother Is Not Qualified as an Expert to Opine on LD's Future Treatment

Defendants next contend that LD's mother, Natascha DiFrancesco is not qualified as an expert to render an opinion as to LD's need for future treatments (Docket No. 58, Defs. Memo. Supp'al Motion at 3), since Mrs. DiFrancesco has degrees in sociology and physical therapy and lacks the medical qualification to opine as to LD's physical care needs (id. at 3; id., Defs. Atty. Decl. ¶ 3, Ex. C, EBT Tr. Natascha DiFrancesco).

Plaintiffs respond that the parents would testify to medical expenses incurred but health care provider witnesses would testify to the medical necessity for future treatment of LD (Docket No. 66, Pls. Atty. Decl. ¶ 37).  They also point out Dr. Bryan and Natascha DiFrancesco are both "health care professionals and have had extensive contact and conversations with the infant plaintiff's health care providers, an understanding of immediate health care surveillance she requires and the fact that they have been informed that the infant plaintiff is a candidate for

41

require [sic] future medical surveillance, treatment, injections, surgery and imaging" (id.).  Both

parents discussed LD's care and future medical needs with treating orthopedic surgeon,

Dr. Devin Peterson (id. ¶¶ 40, 41).

Plaintiff Bryan and Natascha DiFrancesco can testify to the facts of LD's past treatment

and the recommended follow up, with health care providers testifying as to the necessity of

future medical care.  Plaintiffs, however, are not holding them out as "experts," they claim that

Natascha DiFrancesco would testify as to the necessity for LD having future medical care (see

Docket No. 54, Pls. Trial Memo. at 15).  Thus, they cannot invoke Dr. and Mrs. DiFrancesco's

respective experience in health care professions (according to defense moving papers, Natascha

DiFrancesco has degrees in occupational therapy and sociology, Docket No. 58, Defs. Atty.

Decl. ¶ 8) to bolster their factual testimony as to LD's care that any other layperson could testify

to their injured daughter or son.  As refined, defendants' supplemental motion (Docket No. 58) is

**granted in part**.

6.      Physical Therapist Emily Wray Cannot Offer an Expert Opinion on
        Causation or Diagnosis

Defendants caution that plaintiffs' physical therapist, Emily Wray, is not an expert as to

the cause or diagnosis for LD's injuries (Docket No. 58, Defs. Memo. Supp'al Motion at 3-4).

Defendants produced a copy of plaintiff Bryan DiFrancesco's business website for the Active

Body Clinic.  This website listed among the staff of that clinic Ms. Wray (Docket No. 58, Defs.

Atty. Decl., Ex. B).  Plaintiffs, however, offer Ms. Wray's testimony as to her observations in

treating LD in 2015 (Docket No. 66, Pls. Atty. Decl. ¶ 38, Ex. AA; see also Docket No. 54, Pls.

Memo. at 23-24).  Thus, she is being called as a treating witness rather than an expert.  This

Court notes that Wray's employment with Bryan's Active Body Clinic raises issues of bias but

this goes to her ultimate credibility and not to the admissibility of her testimony.  Again, as

modified to restrict her testimony to her factual observations, defendants' motion (Docket

No. 58) is **granted**.

       7.    Plaintiff Father Dr. Bryan DiFrancesco Cannot Opine on Fractures,
               Surgical Procedures on LD

Finally, defendants move to preclude plaintiff Dr. Bryan DiFrancesco from testifying as

an expert on LD's fractures and surgical procedures (Docket No. 58, Defs. Memo. Supp'al

Motion at 4).  Defendants contend that plaintiff Bryan DiFrancesco is a chiropractor,

acupuncturist, and physical therapist and thus lacks the expertise to render an opinion as to LD's

treatment of her fractured femur (id.; Docket No. 58, Defs. Atty. Decl. ¶¶ 3, 8, Ex. B).

Defendants point out that plaintiffs have not provided disclosure of the nature and extend of

future treatments that LD requires (Docket No. 58, Defs. Memo. Supp'al Motion at 4).

Again, plaintiffs are not holding Dr. Bryan out as an "expert," his anticipated testimony is

regarding LD's condition before and after the accident, including the necessity for future

treatment (Docket No. 54, Pls. Trial Memo. at 14); thus, they cannot invoke his expertise in

health care professions as a chiropractor, acupuncturist and physical therapist to bolster factual

testimony as to LD's care that any other parent not in a health care profession could testify for

their injured daughter or son.  It is unclear in this record the extend of Dr. Bryan DiFrancesco's

medical training that he received in obtaining his chiropractic and physical therapy degrees in

Canada.  As refined, defendants' supplemental motion (Docket No. 58) is **granted in part**.

CONCLUSION

For the reasons stated above, plaintiffs' motion in limine (Docket No. 56) is **granted in**

**part, denied in part** as specified above.  Plaintiffs' motion to exclude evidence of infant LD's

assumption of the risk is **denied**, as well as evidence of the release (as being contrary to New York State public policy) is **denied** but on different grounds; their motion to preclude evidence of LD's 2015 clavicle injury at Holimont is **granted in part** with medical records first subject to this Court's in camera review.

Defendants' first motion in limine (Docket No. 53) is **granted in part, denied in part** as provided in detail above.  Their supplemental motion in limine (Docket No. 58) is **granted in part, denied in part** as specified above.

Jury selection and trial is set for **Monday, July 17, 2017**, commencing at 9:30 am (Docket Nos. 69, 71), with a Final Pretrial Conference to be scheduled and a further Pretrial Order to be separately issued.  The Interim Pretrial Conference (Docket Nos. 71, 63), remains set for **Wednesday, April 19, 2017, 10:30 am** (Docket No. 72).

So Ordered.

_/s/ Hugh B. Scott_
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
        March 20, 2017